1
2
3
4        **IN THE UNITED STATES DISTRICT COURT FOR THE**
5                **EASTERN DISTRICT OF CALIFORNIA**
6
7    **JESSE RAY LUCAS,**                )    **1:09-CV-1015  AWI JLT**
                                         )
8                  **Plaintiffs**,       )
         **v.**                          )    **ORDER ON DEFENDANTS'**
9                                        )    **MOTION FOR SUMMARY**
     **CITY OF VISALIA, et al.,**        )    **JUDGMENT**
10                                       )
                                         )
11                 **Defendants.**       )    (Doc. No. 97)
     _____)
12
13
14        This is an excessive force case that arises out of a confrontation between Plaintiff Jesse
15   Lucas ("Lucas") and members of the City of Visalia Police Department.  Lucas brings claims for
16   Fourth Amendment violations under 42 U.S.C. § 1983, state law statutory claims under
17   California Civil Code § 52.1 and § 52.7, and state common law claims for assault and battery,
18   intentional and negligent infliction of emotional distress, and negligence.  Defendants City of
19   Visalia ("City") and Visalia police officers Carmen Esparza ("Esparza") and Sean O'Rafferty
20   ("O'Rafferty") now move for summary judgment on the claims against them.  For the reasons
21   that follow, the summary judgment motion will be granted in part and denied in part.
22
23                        **FACTUAL BACKGROUND**[1]
24        On May 1, 2008, Elise Monpere ("Monpere"), Lucas's then girlfriend and now wife,
25   called 911 for medical assistance for Lucas.  See DUMF 2; PUMF 1.  Lucas, who had a history
26   of seizures since childhood, appeared to be suffering from a seizure.  See PUMF's 1, 2.  From his

---

[1] "DUMF" and "PUMF" refer to Defendants' and Plaintiff's respective Undisputed Material Facts.  Also, both parties make evidentiary objections.  To the extent that the Court relies on evidence that is objected to, the objection is overruled.

past history, Lucas knew that he was not having a life threatening situation and did not need medical treatment.  See PUMF 3.

Firefighters and ambulance personnel arrived at Lucas's apartment, and Monpere let the firefighters and paramedics inside where they conferred with Monpere and Lucas.  See DUMF 4; PUMF 5; Monpere Depo. 52:21-53:23, 69:9-19.  Lucas had drunk 4 to 7 beers earlier that evening and was intoxicated when the firefighters and paramedics arrived.  See DUMF's 3, 5. Lucas repeatedly refused medical treatment and told the firefighters and paramedics that he did not want them there and that he did not call for their assistance.  See Krauss Depo. 33:12-36:12. Although Lucas was not angry when the firefighters and paramedics arrived, the longer those personnel stayed, the angrier Lucas became.  See Lucas Depo. 80:5-81:12.  The firefighters and paramedics continued to stay in the residence because a medical call had been made and the personnel believed that they needed to assess whether Lucas was conscious and capable of making his own decisions.  See Krauss Depo. 35:1-17.  Lucas was using profanity and was adamant that the personnel needed to leave and that he did not want any help.  See id. at 34:22-36:3.  The emergency personnel requested police assistance at Lucas's residence.  See PUMF 7.

Esparza and O'Rafferty were dispatched to the scene in response to the request for officer assistance from the firefighters and paramedics.  DUMF 7.  That is, the officers were dispatched to assist with a "medical call."  O'Rafferty Dec. 2:13.  The officers received information from dispatch that a 24 year old male was having seizures.  See PUMF 8.  The officers were also told by dispatch that Lucas was combative with the firefighters and paramedics.  DUMF 8.

O'Rafferty arrived at the scene first.  PUMF 9.  As he approached the home, O'Rafferty could see medical personnel outside, huddled around the doorstep outside the home, and could see Lucas sitting on a staircase just inside the front door talking to medical personnel.  PUMF 10. A majority of the emergency personnel were outside the residence, and O'Rafferty could not remember whether any were still inside the house.  See PUMF 11.  The paramedics told O'Rafferty that Lucas had not injured anyone on the scene and that Lucas refused medical treatment.  See PUMF 12.  O'Rafferty observed Lucas in angry conversation with other paramedics, and heard Lucas say that he did not want any help.  See PUMF's 13, 14.  Paramedics

1   told O'Rafferty that Lucas had hit a wall in the home, but O'Rafferty does not recall seeing that

2   incident.[2]  See PUMF 15.  O'Rafferty did not discuss any sort of plan with emergency personnel

3   to address the situation, and he could not recall whether the emergency personnel explained that

4   they were trying to assess whether Lucas needed care  See PUMF 17; O'Rafferty Depo. 57:23-

5   58:1.  Also, when O'Rafferty approached the doorway, he observed that Monpere was at the rear

6   of the house away from where Lucas was sitting.  See PUMF 18.  O'Rafferty did not have an

7   opportunity to speak to Monpere.  See id.

8        O'Rafferty entered Lucas's home.  See O'Rafferty Depo. 77:5-12; see also PUMF 20.

9   O'Rafferty explained to Lucas that medical personnel were there to try and help and there was

10  concern that Lucas was mentally altered and intoxicated.  See O'Rafferty Depo. 62:9-22.

11  O'Rafferty observed signs of intoxication, including bloodshot watery eyes and thick speech.

12  See id. at 62:23-25.  Lucas did not appear to be in grave physical danger to O'Rafferty.  See id. at

13  72:1-4.  O'Rafferty understood clearly that Lucas did not want to be treated and that Lucas

14  wanted everyone to leave.  PUMF 19.  Lucas became more agitated and continued to insist that

15  all personnel leave.  See PUMF 21.  Lucas had calmed down a bit.  See PUMF 23.

16        Esparza then arrived, and Lucas became more agitated.  See PUMF 24.  Esparza could

17  hear Lucas object to O'Rafferty being in the home, and could see both that Lucas was not in

18  medical danger, and that Monpere was not physically harmed.  See PUMF 25.  Esparza did not

19  see any emergency personnel inside the home, and it was her impression that all emergency

20  personnel were outside.  See PUMF 26; Esparza Depo. at 57:7-10.  Esparza entered Lucas's

21  home.  See PUMF 27.

22        Lucas clearly told both Esparza and O'Rafferty that he refused medical treatment and

23  requested that all personnel leave his home.  See PUMF 28.  Lucas cursed at the officers and

24  emergency personnel.  See DUMF 9.  Lucas then turned and began to walk up the stairs and said

25  that he was going to bed and that they all needed to leave.  See PUMF 29.  Esparza clearly heard

26

27        [2]Esparza's declaration indicates that she witnessed Lucas punch a hole in the wall.  See Esparza Dec. at 3:6-
     7.  However, Esparza testified that O'Rafferty had told her that Lucas had punched a hole.  See Esparza Depo.

28   98:17-99:3.  That is, Esparza's deposition indicates that she was not present and did not see Lucas punch the wall.
     Because the Court views the evidence in the light most favorable to Lucas, Stegall v. Citadel Broad, Inc., 350 F.3d
     1061, 1065 (9th Cir. 2003), for purposes of this motion, Esparza did not see Lucas punch a hole in the wall.

3

1   Lucas say this.  See id.  Lucas continued to curse as he went up the stairs.  See DUMF 11.

2       Esparza and O'Rafferty were concerned for the safety of everyone in the residence,

3   including Lucas and Monpere, and so followed Lucas up the stairs.  See DUMF 12; PUMF 31.

4   Esparza was the first officer behind Lucas as they went up the stairs, and O'Rafferty followed

5   behind Esparza.  See DUMF's 14, 15.  Lucas is 6' 1" and weighs 210 lbs., Esparza is 5' 1" and

6   115 lbs., and O'Rafferty is 6' 6" and 230 lbs.  See DUMF 1; Esparza Dec. at 1:28; O'Rafferty

7   Depo. 9:18-20.  Lucas said nothing about getting a weapon and made no threats to the officers,

8   and there had been no mention of weapons by Lucas or anyone on site.  See PUMF 30;

9   O'Rafferty Depo. 119:5-22.  Lucas did not make any verbal threats or physically assault anyone

10  in the residence.  See PUMF 34.  At no point during the incident did Lucas yell at Monpere.  See

11  Monpere Depo. 56:5-8.  Further, Esparza testified that she believed that all emergency personnel

12  were outside the residence, and she did not know where Monpere was.  See PUMF 62.

13      When Lucas reached the top of the stairs, he was turning around.  See Lucas Depo.

14  123:18-124:7.  Esparza believed that Lucas was adopting an aggressive stance when he turned

15  around.  DUMF 17.  Esparza has declared that, at the top of the stairs, Lucas turned around,

16  yelled at the officers to leave, made eye contact with O'Rafferty, clenched his fist, looked at

17  O'Rafferty again, and then lunged forward.  See Esparza Dec. at 3:17-23.  Lucas testified that he

18  was not aggressive towards the officers, and that he was tased as he was facing away from the

19  officers and turning around.  See Lucas Depo. 79:18-80:7, 234:3-10.  Esparza did not give Lucas

20  a warning before deploying the taser.  See PUMF 36; Doc. No. 97-1 at 11:19-21.  The taser darts

21  struck Lucas in the stomach area (in the upper-stomach right of center area and the waist right of

22  center area).  See DUMF 18; Esparza Dec. 3:25-27.  The report from Esparza's taser unit

23  indicates that Esparza administered a cycle of 10 seconds, which means that Esparza held the

24  trigger down for 10 seconds.[3]  See PUMF's 37, 39.  Lucas fell to the ground.  See DUMF 19.

25  Esparza told Lucas to roll onto his stomach and put his hands behind his back.  DUMF 20.

26  Lucas's body was somewhat tense and his upper body was flexed.  See O'Rafferty Depo. 89:1-

27

28          [3]The taser has an initial 5 second cycle, and in order to have a cycle that lasts longer than 5 seconds, the
    trigger must be held for more than 5 seconds.  See Clark Dec. ¶ 14; Epp Depo. 135:5-20.

12.  In order to gain compliance, Esparza cycled the taser a second time.  See PUMF 41; DUMF 22.  O'Rafferty has no recollection of Esparza giving Lucas a warning that she would use the taser a second time, but Esparza testified that a warning was given.  See Esparza Depo. 81:8-19; O'Rafferty Depo. 90:7-24.  Lucas complied with the directions to place his hands behind his back after Esparza cycled the taser a second time.  See DUMF 23.

Lucas was then placed on a gurney and began to struggle again.  See DUMF 24.  Lucas was then strapped to the gurney, and taken to Kaweah Delta Hospital for treatment.  See DUMF's 25, 26.  After treatment, Lucas was taken to jail.  See PUMF 45.

Esparza charged Lucas with violations of Penal Code sections 148 (hindering a police officer/resisting arrest), 415(2) (disturbing the peace), 647(f) (public intoxication), and Health and Safety Code § 11550 (being under the influence of a controlled substance).  PUMF 47.  Esparza based the § 11550 charged on Lucas's actions in failing to cooperate, but that charge was dropped after the toxicology report returned negative findings.  See PUMF's 48, 49.

The City's taser use policy requires initial certification before use, recertification if the officer has not carried a taser in the previous six months, and further training if deemed appropriate by training manager.  DUMF 35.  Esparza was certified for taser use on March 24, 2007, O'Rafferty was certified for taser use on April 19, 2007, and both attended recertification training on October 19, 2007.  See  DUMF's 31, 32.  The City's taser training includes training officers to watch for loss of consciousness and to consider having emergency medical services attend to any person who has been tased.  DUMF 34.  The City has a written policy that states that verbal warnings of an officer's intention to use a taser shall precede actual use of the taser, "unless it would otherwise endanger officer safety or is impractical under the circumstances . . . ."  See DUMF 28.  The City's taser training includes distribution of any product warnings published by the manufacturer.  DUMF 33.  One such warning was issued on April 12, 2006, and April 28, 2008, and read: "Seizure Risks.  Repetitive stimuli such as flashing lights or electrical stimuli can induce seizures in some individuals.  This risk is heightened if electrical stimuli or current passes through the head region."  DUMF 29.  This warning was distributed and discussed at the certification training for both Esparza and O'Rafferty.  See DUMF 30.

5

The City requires that every use of a taser be followed by a Taser Use Report, even if the officer only uses the laser pointing feature.  <u>See</u> DUMF 36.  The City's practice at the time of the incident was to have each Taser Usage Form reviewed by the Lieutenant in charge of Police Standards for a determination as to whether the use of the taser warranted clearance, discipline, correction, or review of the policy.  DUMF 39.  Esparza's use of her taser in this case and O'Rafferty's presence were reported on a Taser Use Report.  DUMF 37.  Esparza's Taser Use Report was reviewed by the officer in charge of Police Standards and determined to be within departmental policy.  DUMF 38.  No investigation was conducted with respect to Esparza and O'Rafferty's conduct.  <u>See</u> Lynn Depo. 90:6-25.

The City's police officers receive training on issues regarding the Fourth Amendment as part of the field training program and would also receive periodic updates to coincide with recent court decisions.  <u>See</u> Lynn Depo. 40:10-43:19.  The City's Person Most Knowledgeable testified that there does not appear to be any training materials regarding the use of a taser on someone involved in a medical aid call, on someone who is refusing medical treatment, or on someone who might have had a seizure or was complaining of seizures.  <u>See</u> Epp Depo. 114:21-115:14.  There does not appear to be formal training by the City on how to recognize certain medical conditions, such as diabetic shock, heart attack, or seizure.  <u>See</u> Lynn Depo. 85:20-86:11.

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v. American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  <u>See</u> <u>Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or

7

1   promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

2   15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

3   Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

4   "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

5   'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

6   F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

7   circumstances to consider materials that are not properly brought to its attention, but the court is

8   not required to examine the entire file for evidence establishing a genuine issue of material fact

9   where the evidence is not set forth in the opposing papers with adequate references.  See

10  Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc.,

11  575 F.3d 1040, 1058 (9th Cir. 2009); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

12  889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir.

13  2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of

14  material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

15

16                              **DEFENDANTS' MOTION**

17  **I.      Fourth Amendment Claims Against Officers**

18  *Defendants' Argument*

19          Defendants argue that the officers' conduct was reasonable.  The facts show that Lucas

20  wanted to be left alone, but they also show that he was angry at the officers and at the emergency

21  personnel.  Lucas was so angry that he punched a hole in the wall and began retreating upstairs to

22  rooms that could have contained anything.  When Lucas reached the top of the stairs, Esparza

23  was behind him and in a vulnerable position.  Lucas then turned again to yell.  Lucas was over

24  six foot tall and weighed over 200 pounds, while Esparza was just over five foot tall and 115

25  pounds.  Lucas had disobeyed Esparza's commands not to retreat, and she viewed Lucas as a

26  threat to the safety of everyone in the house, including himself and Monpere.  When Lucas

27  turned, Esparza deployed her taser to subdue a large, irate, drunken individual who appeared to

28  pose a risk to herself and those behind her.  Although she did not give a warning before

1   deploying the taser, she had no time to do so.  After the initial taser deployment, Esparza used a

2   second taser cycle because Lucas refused to comply with her commands that he show his hands.

3   Lucas's unstable and violent behavior created a tenuous situation that created a safety risk to all

4   present, including Monpere, and Esparza's use of force was reasonable.

5       Alternatively, Defendants argue that qualified immunity is appropriate.  There are no

6   Ninth Circuit cases that predate the events of this case and indicate a violation of a clearly

7   established right.  In 2011, however, the Ninth Circuit found that the law regarding taser use at

8   the time of this case was not so clear that officers would know that tasing a pregnant woman who

9   refused to sign a traffic ticket and who pushed a police officer away from her breasts was

10  unconstitutional.  If the law was unsettled with respect to the pregnant woman, it would be

11  unsettled as to the large, drunk, and irate Lucas.

12      *Plaintiff's Opposition*

13      Lucas argues that the officers entry into his residence was unreasonable.  The officers did

14  not have consent to be in his home.  Further, Lucas repeatedly and clearly told the officers to

15  leave, but when he attempted to go upstairs to his bed, the officers unlawfully followed him.

16  Neither consent nor any other theory justified the unlawful entry into the residence.  Because the

17  officers' entry into the residence was unlawful, so too was the subsequent tasing and arrest.

18      Lucas also argues that none of the relevant criteria support Esparza's use of force.  The

19  officers were called to the residence regarding a medical situation and there were no crimes at

20  issue when Esparza deployed the taser.  There is no evidence that objectively shows that Lucas

21  posed an immediate threat to the safety of the officers or anyone, a position which is buttressed

22  by the officers' failure to charge Lucas with assault.  The officers also knew that Lucas had

23  seizures and was impaired, but did not respect Lucas's personal space or slow down the situation.

24  Esparza gave no warning before using her taser the first time, and did not give Lucas sufficient

25  time to comply before she cycled the taser a second time.  Instead of a taser, the officers could

26  have used a "firm grip" on Lucas.  In light of these considerations, use of the taser was improper.

27      With respect to qualified immunity, Lucas argues that there was no exigent circumstance

28  that would justify entry into Lucas's residence, and the Supreme Court has made clear that the

1 consent to enter by one occupant cannot trump the express objection of another occupant.

2 Further, there was no probable cause to enter Lucas's home, and courts recognized that, in 2006,

3 a reasonable officer would have known that multiple taser applications on a person who had just

4 suffered a seizure constitutes excessive force.

5     *Legal Standard*

6     1.    Excessive Force

7     All claims that law enforcement officers used excessive force, either deadly or non-

8 deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be

9 analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Scott v.

10 Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  The

11 pertinent question in excessive force cases is whether the use of force was "objectively

12 reasonable in light of the facts and circumstances confronting [the officers], without regard to

13 their underlying intent or motivation."  Graham, 490 U.S. at 397; Blankenhorn v. City of Orange,

14 485 F.3d 463, 477 (9th Cir. 2007).  The objective inquiry into reasonableness is highly fact

15 specific, see Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).

16 "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the

17 governmental interests at stake by evaluating a range of factors."  Liberal v. Estrada, 632 F.3d

18 1064, 1079 (9th Cir. 2011).  Factors that are considered in assessing the government interests at

19 stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses

20 an immediate threat to the safety of the officers or others, and whether he is actively resisting

21 arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d

22 at 477.  Further, where it is or should be apparent that an individual is emotionally or mentally

23 unstable, that is a factor that must be considered in determining the reasonableness of the force

24 employed.  See Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  In some

25 cases, "the availability of alternative methods of capturing or subduing a suspect may be a factor

26 to consider."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).  However, police

27 officers "are not required to use the least intrusive degree of force possible" as long as the force

28 actually used was reasonable.  Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994);

see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008).  That is, a reasonable use

of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will

not render conduct unreasonable."  Wilkinson, 610 F.3d at 551.  It may also be appropriate to

consider the parties "'relative culpability,' i.e. which party created the dangerous situation and

which party is more innocent . . . ."  Espinosa v. City & County of San Francisco, 598 F.3d 528,

537 (9th Cir. 2010); see Scott, 550 U.S. at 384.  Reasonableness "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550.  "The calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount

of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97; Wilkinson, 610

F.3d at 550.  "Force is excessive when it is greater than is reasonable under the circumstances."

Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).  Where the circumstances show that there is

no need for force, any force used is constitutionally unreasonable.  Fontana v. Haskin, 262 F.3d

871, 880 (9th Cir. 2001).

>        2.      Qualified Immunity

Qualified immunity protects "government officials . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

can be made," and that it is "often difficult for an officer to determine how the relevant legal

doctrine will apply to the factual situation that he faces." Estate of Ford v. Ramirez-Palmer, 301

F.3d 1043, 1049 (9th Cir. 2002).

A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

Cir. 2006); Brittain, 451 F.3d at 987.  However, lower courts need not strictly follow the tiered

sequence in analyzing qualified immunity, but instead may dispose of the issue at step two

without addressing step one.  Pearson v. Callahan, 555 U.S. 223 (2009); Moss v. United States

Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).  Under the first step, the court determines

whether, "taken in the light most favorable to the party asserting the injury, do the facts show the

officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201; Phillips, 477 F.3d at

1079; Skoog, 469 F.3d at 1229.  If the answer is "no," then the inquiry ends and the plaintiff

cannot prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at

201; Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of

L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).

Under the second step, the court determines "whether the right was clearly established,"

and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th

Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is

whether "the contours of the right were sufficiently clear that a reasonable official would

understand that what he is doing violates the right."  Saucier, 533 U.S. at 202; Phillips, 477 F.3d

at 1079.  Whether a right is clearly established must be "undertaken in light of the specific

context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201; Skoog, 469

F.3d at 1229-30.  In making this determination, the court considers the state of the law at the time

of the alleged violation, but it is unnecessary for the precise conduct in question to have been

previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045,

1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at

the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton,

483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th

Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not

violate a clearly established constitutional right, then the officer will receive qualified immunity.

See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v.

City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see

Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual  officer are . . .irrelevant."

Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies if "a

reasonable officer could have believed [the action] to be lawful, in light of clearly established law

and the information the . . . officer[] possessed." Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.

*Discussion*

1.   Fourth Amendment – Taser Applications

Lucas complains of two taser applications in this case.  The Court will examine each taser application separately.  See De Contreras v. City of Rialto, 894 F.Supp.2d 1238, 1252 n.12 (C.D. Cal. 2012); Sanders, 551 F.Supp.2d at 1167.

a.   1st Taser Application

As indicated above, the Court must examine not only certain enumerated considerations, but also any other pertinent consideration that is part of the totality of the circumstances.

First, the force at issue is a taser application in "dart mode."[4]  The Ninth Circuit has quantified this type of force.  The use of a taser in dart mode is an "intermediate or medium, though not insignificant, quantum of force."  Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010); Sanders, 551 F.Supp.2d at 1168.

Second, it is not clear that any crime, either misdemeanor or felony, was at issue. Defendants have not identified a crime, and the evidence shows that the officers were present at Lucas's house because they received a "medical call," not a "criminal call," about a combative and uncooperative male who was having seizures.  See O'Rafferty Dec. 2:13; PUMF 8. Although Lucas was charged with public intoxication, disturbing the peace, hindering a police officer, and being under the influence of a controlled substance,[5] see PUMF 47, Defendants have not argued that any of these crimes were at issue at the time of the first tasing.  It is unclear exactly what conduct formed the bases of these charges, nor is it clear that reasonable suspicion

---

[4] The taser uses "compressed nitrogen to propel a pair of 'probes'— aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011); Bryan v. MacPherson, 630 F.3d 805, 822 (9th Cir. 2010).

[5] Lucas pled "no contest" to the public intoxication charge (Penal Code § 647(f)) and the disturbing the peace charge (Penal Code § 415(2)).  See Lucas Depo. 84:2-4, 85:14-19.  It is unknown at what point the officers developed probable cause to arrest Lucas for these charges.

1   or probable cause existed for the charges.  In the absence of argument from Defendants on this

2   point, the Court concludes that no crime was at issue at the time of the first tasing.[6]

3         Third, it is true that Lucas was not particularly communicative or cooperative.  Lucas was

4   attempting get away from all personnel, including the officers, when he went up the stairs.

5   However, there is no evidence that indicates the officers were attempting to effectuate an arrest

6   when Lucas went up the stairs, nor do the officers state that they were attempting to arrest Lucas.

7   Therefore, Lucas was neither evading nor resisting arrest.

8         Fourth, it appears that the emergency personnel were outside the residence, see PUMF

9   26; Esparza Depo. 57:7-10, 65:18-22, Monpere was on the bottom floor away from Lucas, see

10   PUMF 18; Esparza Decl. at 3:11-12,[7] and Lucas was at the top of the stairs on the second floor.

11   See DUMF 16.  That is, neither Monpere nor emergency personnel were near Lucas when he was

12   tased.  Also, Lucas never yelled at Monpere, did not make verbal threats against anyone, did not

13   threaten to get a weapon, and had not physically assaulted anyone.  See PUMF's 30, 34; Monpere

14   Depo. 56:5-8.  Therefore, Lucas posed no immediate threat to either the emergency personnel or

15   to Monpere.

16         Fifth, there is a genuine issue of disputed material fact regarding whether Lucas posed a

17   threat to either Esparza or O'Rafferty.  It is undisputed that Lucas never verbally threatened the

18   officers, did not physically assault the officers, and did not threaten to get a weapon.  See

19   PUMF's 30, 34. It is also undisputed, however, that Lucas was angry, yelling, using profanity,

20   and was to some degree intoxicated.  See DUMF's 3, 9; PUMF 28; Lucas Depo. 80:5-81:12.

21   Further, Esparza appears to have been aware that Lucas had punched a hole in the wall, but  did

22   not actually see it.  See Esparza Depo. 98:17-99:3.   The genuine dispute is after Lucas turned

23   and went to the top of the stairs.  Esparza's declaration states that when Lucas reached the top of

24

25         [6]Alternatively, each crime charged was a non-violent misdemeanor, which, even taken together, would not
    of themselves support use of the taser.  See Young v. County of Los Angeles, 655 F.3d 1156, 1164-65 (9th Cir.
26   2011); Bryan, 630 F.3d at 828-29 & n.12; Carter v. City of Carlsbad, 799 F.Supp.2d 1147, 1157 (S.D. Cal. 2011);
    Cal. Pen. Code §§ 148(a)(1), 412(2), 647(f); Cal. Health & Safety Code § 11550.

27         [7]Esparza's declaration indicates that Monpere was on the first floor being comforted by emergency
28   personnel.  However, Esparza's deposition indicates that her perception was that emergency personnel were not in
    the home.  See Esparza Depo. 54:19-21, 57:7-10, 65:18-22.  The Court must construe the evidence in favor of Lucas.
    Thus, for purposes of this motion, emergency personnel were not in the home and Monpere was on the bottom floor.

14

the stairs, he turned around, made eye contact with O'Rafferty, clinched his fists, and lunged

forward, i.e. towards her and O'Rafferty.  See Esparza Dec. 3:18-23.  This is aggressive conduct.

Considering that Lucas was a foot taller and nearly one hundred pounds heavier than Esparza,

and that Lucas appeared angry, Esparza's version of events shows that Lucas posed an immediate

threat to her, and possibly to O'Rafferty who was close behind.  On the other hand, Lucas has

testified that he did not act aggressively towards the officers, and, at the time he was tased, he

was facing away from Esparza and was turning around to again tell the officers to leave.[8]  See

Lucas Depo. 79:18-80:7, 234:3-10.  Lucas's version does not suggest that he lunged, that his fists

were clenched, that he had made eye contact or was looking at O'Rafferty, or that he had turned

around and was facing Esparza.  If Lucas's back or side was to the officers, then he was not

turned around and could not have lunged forward as described by Esparza.  Without the lunge

forward, there is no immediate threat.  Because this is summary judgment, the Court must credit

Lucas's version of events.  See Stegall, 350 F.3d at 1065.  Therefore, at the time Esparza tased

Lucas, Lucas did not pose an immediate threat to either Esparza or O'Rafferty.

Sixth, Esparza did not warn Lucas before deploying her taser.  See PUMF 36; Doc. No.

97-1 at 11:19-21.  Lucas did not lunge and was in the process of turning around when Esparza

deployed the taser.  Because the evidence does not indicate that Lucas was lunging, there is no

reason why Esparza could not have given a warning.

Seventh, Lucas was intoxicated to some degree, and was angry that the emergency

personnel and the police officers would not leave his home.  See DUMF 5; PUMF 28.  The

intoxication and the anger clearly affected the dynamic of the situation, and more than likely

contributed to Lucas punching a hole in the wall.  While the alcohol and anger likely affected

Lucas's thought process, there is no evidence that Lucas was suffering from a clinical mental

condition that was affecting his perception of reality.  Lucas knew why personnel were present,

he just did not want them in his home and he did not want any medical treatment.

Eighth, Lucas's police procedures expert, Roger Clark, has indicated that a "firm grip"

[8]The description that the taser darts stuck in Lucas's upper stomach and waist, but right of center, seems consistent with Lucas turning towards the officers.  See Esparza Dec. 3:25-27; Lynn Dec. Ex. B.

15

1    was a possible alternative to the taser.  See Clark Dec. ¶ 9.  In essence, a "firm grip" is simply

2    reaching out and grabbing hold of an individual.  See Azevedo v. City of Fresno, 2011 U.S. Dist.

3    LEXIS 10132, *30 (E.D. Cal. Jan. 25, 2011).  The Court is skeptical that a "firm grip" was a

4    reasonable option given the size disparity between Lucas and Esparza.  Nevertheless, because the

5    Court accepts that Lucas had not fully turned around and was not lunging, the Court accepts that

6    a "firm grip" was an alternative use of force.

7           Finally, in terms of the relative culpability of the parties, this situation would not have

8    occurred had Lucas simply let the emergency personnel examine him.  Conversely, the situation

9    also would not have occurred if the officers had accepted that Lucas was declining treatment and

10   then obeyed any one of the numerous requests to leave his home.  The officers were responding

11   to a medical aid call in which Lucas was described as being combative with emergency

12   personnel.  However, there has been no evidence that Lucas was in medical danger, or that the

13   officers perceived Lucas to be in medical danger.  Cf. O'Rafferty Depo. 62:17-25; PUMF 25.

14   Further, by the time of the first taser application, it appears that the emergency personnel were

15   out of the home.  See Esparza Depo. 54:19-21, 57:7-10, 65:18-22.  That is, there was no medical

16   personnel near Lucas for him to "combat."  The Court is unaware of any authority that would

17   require Lucas to submit to the emergency personnel's request for an examination, or that would

18   permit the officers to require Lucas to submit to an examination under these circumstances.

19   Although Lucas was angry and Monpere was in the home, there is no evidence that his anger was

20   ever directed towards her or that he ever yelled at her.  Instead, Lucas's anger and frustration was

21   consistently directed at the failure of the emergency personnel and the officers' failure to leave

22   his home and accept that he did not want medical treatment.  That is, it was the officers' and

23   emergency personnel's continued presence, not Monpere's presence or anything that Monpere

24   did, that was the source of the anger.  Given the reason for the police officers' presence, and the

25   nature of the call to the residence, Lucas's repeated yelling at the officers to leave his home does

26   not show that Monpere was in danger.  Finally, as Lucas was going up the stairs, he clearly told

27   the officers that he was going to bed and that everyone needed to leave.  See PUMF 29.  Lucas

28   did not make a threat, say that he was getting a weapon, or say that he would be coming back

down.  His statement indicates that he was terminating the encounter and that it was time for all to leave. There has been no authority cited to indicate that Lucas was required to undergo treatment, that he could not order personnel to leave, or that he could not go to his own bedroom. Viewing the evidence presented in the light most favorable to Lucas, the conduct of the officers appears to be the more culpable.

When viewed in the light most favorable to Lucas, the evidence is sufficient for a reasonable jury to conclude that Esparza used excessive force.  The evidence does not demonstrate any justification for the use of the taser.  Generally the most important factor in the use of force analysis is the danger posed by the plaintiff to either the law enforcement officer or to third parties.  See Mattos, 661 F.3d at 441.  Here, Lucas was not lunging and was nowhere near third parties.  Lucas was not an immediate threat to any one.[9]  The additional considerations also generally support a finding of excessive force.  There was either non-violent misdemeanors or no crimes at issue, there was an alternative to the taser in the "firm grip," Lucas was not evading or resisting arrest, and the officers' conduct was the more culpable for not honoring clear requests to leave and clear refusals of medical treatment.  Summary judgment on this claim is inappropriate.

> b.    Second Taser Application

The second taser application occurred shortly after the first.  The taser barbs and wires were attached to Lucas.  The quantum of force remains intermediate and significant.  See Bryan, 630 F.3d at 826; Sanders, 551 F.Supp.2d at 1168-74.

Again, Defendants have not identified what crime, if any, was at issue at the time of the second tasing.  Even assuming that one or all of the charged offenses were at issue, they are non-violent and do not themselves justify the use of the taser.  See Young v. County of Los Angeles, 655 F.3d 1156, 1164-65 (9th Cir. 2011); Bryan, 630 F.3d at 828-29 & n.12; Cal. Pen. Code §§ 148(a)(1), 412(2), 647(f); Cal. Health & Safety Code § 11550.

In terms of evading arrest, Lucas was on his stomach.  He was not in flight and he was

---

[9]Again, there is a genuine dispute of material fact.  If Lucas had a clinched fist and had lunged as Esparza described, he would have been an immediate threat to Esparza.

not evading arrest.  However, Lucas was not complying with instructions to roll onto his stomach and place his hands behind his back.  See Esparza Depo. 78:22-80:11.  Further, it does not appear that he was cooperative when O'Rafferty attempted to roll Lucas over and handcuff him.  See O'Rafferty Depo. 89:23-91:6.  This indicates resistance.  However, Defendants have not explained what crime they had probable cause to arrest Lucas for, and as Lucas points out, if the officers' conduct was unlawful, then Lucas could nonviolently resist their actions.  See In re Michael V., 10 Cal.3d 676, 681 (1974); Evans v. City of Bakersfield, 22 Cal.App.4th 321, 331 n.10 (1994); cf. Maxwell v. County of San Diego, 394 F.3d 689, 695 (9th Cir. 2013) ("[California Penal Code §148(a)] does not make it a crime, however, to resist unlawful orders.").  Neither O'Rafferty nor Esparza have characterized Lucas's conduct after he was tased the first time as "violent."  Rather, Esparza indicates that Lucas was merely keeping his hands under his body.  See Esparza Dec. 4:3-4.

With respect to danger posed to the officers or third parties, again, Lucas was no where near third parties.  Further, Lucas was on his stomach, and there is no evidence that he was assaulting or attempting to harm either O'Rafferty or Esparza when the second taser application was given.

As to a warning, Esparza testified that she warned Lucas that she would use the taser again if he did not comply.  See Esparza Depo. 80:12-24.  Although O'Rafferty does not recall hearing the warning and Esparza did not include the warning as part of her report, see Esparza Depo. 81:8-19; O'Rafferty Depo. 90:7-21, Lucas does not cite any evidence that affirmatively states that no warning was given.  In the absence of an actual contradiction, the Court concludes that Esparza warned Lucas.

With respect to alternative methods of force, no alternatives are discussed regarding the second taser application.

As for mental conditions, little changed between the first and second taser applications.  Lucas remained to some degree intoxicated and angry.

Finally, in terms of relative culpability, the second taser application would not have been necessary had Lucas simply followed instructions and brought his hands from behind his back.

However, it is not clear that the officers were acting lawfully, in which case Lucas could non-violently resist their actions. Merely keeping one's hands under one's body does not constitute violent resistence.

When viewed in the light most favorable to Lucas, a reasonable jury could conclude that Esparza's second use of the taser constituted excessive force. At best non-violent misdemeanors may have been at issue, Lucas was not an immediate threat to anyone, and, because it is not clear that the officers were acting lawfully, Lucas could have been within his rights by non-violently refusing to put his hands behind his back. Summary judgment on this claim is inappropriate.

### 2. Qualified Immunity

#### a. First Taser Application

The officers rely on *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) to argue that qualified immunity is appropriate. The *Mattos* decision was a consolidated opinion that involved two separate cases, *Brooks v. City of Seattle* and *Mattos v. Agarano*. See *Mattos*, 661 F.3d at 436. Both cases involved the use of a taser on a person who was charged with misdemeanors.

In *Brooks*, Mrs. Brooks was pulled over by Officer Ornelas for speeding in a school zone in November 2004. See id. at 437. Brooks was 33 years old and 7 months pregnant. Brooks insisted that she was not speeding and refused Ornelas's order to sign the traffic ticket. See id. She also refused to sign the ticket when Officer Jones arrived and asked her to do so. See id. When a sergeant arrived on the scene, Brooks continued to refuse to sign the ticket. See id. The sergeant then ordered the officers to arrest Brooks. See id. Brooks refused to get out of her vehicle. See id. The officers explained what a taser was, and Brooks warned that she was pregnant. See id. The officers then consulted on where to use the taser on Brooks. See id. Ornelas then opened the driver's side door and twisted Brooks's arm behind her back. See id. Brooks then stiffened her body and grabbed the steering wheel in order to prevent the officers from removing her. See id. Jones then cycled his taser to show Brooks what the taser would do. See id. Ornelas was able to take the keys out of the vehicle and still held Brooks's arm behind her back. See id. Jones then applied the taser to Brooks's left thigh in the drive-stun mode. See id. Brooks cried and started honking her horn. See id. Jones then applied the taser to

Brooks's left arm, but Brooks continued to cry and honk her horn.  See id.  Jones then applied the taser to Brooks's neck, which caused Brooks to fall over.  See id.  The officers dragged Brooks out of her car and arrested her.  See id.  The Ninth Circuit found a Fourth Amendment violation.  See id. at 446.  However, the Ninth Circuit then evaluated *Russo v. City of Cinncinati*, 953 F.2d 1036 (6th Cir. 1992), *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), and *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), which all dealt with taser uses prior to Brooks's incident.  See id. at 446-48.  The Ninth Circuit held that these cases found no Fourth Amendment violations and were not sufficiently similar and clear that Officers Jones and Ornelas would know beyond debate that they were violating Brooks's Fourth Amendment rights.  See id. at 448.

It appears to the Court that the key factor in *Brooks* was Brooks's actively resisting arrest.  Brooks refused to sign the ticket, refused to get out of the car after she was placed under arrest, and actively impeded the officers' attempts to remove her from her car.  In this case, however, Lucas never actively resisted, was not placed under arrest, and was not warned that a taser would be used.  Under the facts of Lucas's deposition, he was attempting to end the encounter and go to bed.  When he stopped at the top his stair case, he was not under arrest, and he did not lunge or behave in an aggressive manner.

In *Mattos*, Officers Agarano, MacKnight, Kunioka, and Aikala responded to a 911 domestic disturbance call involving Mr. and Mrs. Mattos in August 2006.  See id.  When the officers arrived, Mr. Mattos was sitting on the stairs outside the front door next to several open beer bottles.  See id.  Mr. Mattos said that he and his wife had an argument but that nothing physical occurred.  See id.  Mr. Mattos was 6' 3", weighed 200 lbs., and smelled of alcohol.  See id.  When Kunioka continued to question him, Mr. Mattos became agitated and rude.  See id.  Mr. Mattos went inside to get his wife for the officers to talk to.  See id.  When Mr. Mattos went inside his home, Agarano stepped inside.  See id. at 439.  Mr. Mattos became angry when he saw Agarano inside, and ordered Agarano to get out.  See id.  Agarano asked Mrs. Mattos if he could speak with her outside, and she agreed.  See id.  Before Mrs. Mattos could go outside, Aikala entered the home, stood in the middle of the living room, and announced that Mr. Mattos was under arrest.  See id.  Mrs. Mattos was standing in between her husband and Aikala.  See id.  As

Aikala moved to arrest Mr. Mattos, he pushed up against Mrs. Mattos's chest.  See id.  Mrs.
Mattos then extended her arm to stop her breasts from beings smashed against Aikala's body.
See id.  Aikala asked if Mrs. Mattos was touching an officer.  See id.  Mrs. Mattos was trying to
speak to Agarano and ask him why her husband was under arrest.  See id.  Mrs. Mattos was
trying to diffuse the situation and was asking for everyone to step outside.  See id.  Without
warning, Aikala shot his taser at Mrs. Mattos in dart mode.  See id.  Mrs. Mattos fell to the floor.
See id.  Mr. Mattos was arrested and charged with harassment and resisting arrest, and Mrs.
Mattos was charged with harassment and obstruction.  See id.  The charges were later dropped.
See id.  The Ninth Circuit found that Aikala used excessive force against Mrs. Mattos.  See id. at
451.  However, the Ninth Circuit granted the officers qualified immunity.  See id. at 452.  The
Ninth Circuit found that there was no relevant Supreme Court or Ninth Circuit precedent on the
issue of tasers used in dart mode, and the facts in Mrs. Mattos's case were readily distinguishable
from *Russo*, *Hinton*, and *Draper*.  See id.

     The facts in *Mattos* are distinguishable from the facts in this case.  Mrs. Mattos reached
out and pushed away from Aikala who was attempting to arrest Mr. Mattos.  She was also
attempting to find out why her husband was under arrest and to get everyone to calm down and to
go outside.  Although good intentioned, she was still arguably impeding the arrest of a large,
angry, and intoxicated man.  In this case, however, there was no arrest being attempted.  Lucas
was attempting to end the encounter and to go to bed in his own home, he was not hindering or
evading arrest.  The emergency personnel were not present, and Lucas had refused treatment.
Moreover, the officers have not testified that Lucas was tased because he was hindering an arrest.
Esparza declared that Lucas was tased because he exhibited aggressive behavior and lunged in
her direction.  However, Lucas's deposition does not indicate aggressive behavior and does not
indicate that a lunge occurred.  The facts in *Mattos* are distinguishable from this case.

     The officers also cite to *Draper*, which is the most analogous of the three sister circuit
cases addressed in *Mattos*.  In *Draper*, Draper was pulled over on the side of the road by Officer
Reynolds based on an inadequately illuminated license tag light, i.e. a traffic offense.  Draper,
369 F.3d at 1272-74.  Reynolds asked Draper no less than 5 times to produce his driver's license,

1   proof of insurance, and bill of lading, but Draper never complied.  See id.  Draper became

2   belligerent, confrontational, excited, and was actively pacing, and he accused Reynolds of

3   harassing him and complained about Reynolds shining a flashlight in his (Draper's) eyes.  See id.

4   Draper was told to stop yelling, and was told that his actions were putting Reynolds on the

5   defensive.  See id.  After the fifth request by Reynolds for Draper to produce a driver's license,

6   Reynolds shot Draper with a taser.  See id.  Reynolds told other officers that he believed Draper

7   was about to fight him.  See id.  Draper was charged with obstruction and having an improperly

8   illuminated taillight.  See id. at 1274.  In finding no constitutional violation, the Eleventh Circuit

9   explained:

> In the circumstances of this case, Reynolds's use of the taser gun to effectuate the
> arrest of Draper was reasonably proportionate to the difficult, tense and uncertain
> situation that Reynolds faced in this traffic stop, and did not constitute excessive
> force. From the time Draper met Reynolds at the back of the truck, Draper was
> hostile, belligerent, and uncooperative. No less than five times, Reynolds asked
> Draper to retrieve documents from the truck cab, and each time Draper refused to
> comply. Rather, Draper accused Reynolds of harassing him and blinding him with
> the flashlight. Draper used profanity, moved around and paced in agitation, and
> repeatedly yelled at Reynolds. Because Draper repeatedly refused to comply with
> Reynolds's verbal comments, starting with a verbal arrest command was not
> required in these particular factual circumstances. More importantly, a verbal
> arrest command accompanied by attempted physical handcuffing, in these
> particular factual circumstances, may well have, or would likely have, escalated a
> tense and difficult situation into a serious physical struggle in which either Draper
> or  Reynolds would be seriously hurt. Thus, there was a reasonable need for some
> use of force in this arrest.
>
> Although being struck by a taser gun is an unpleasant experience, the amount of
> force Reynolds used - a single use of the taser gun causing a one-time shocking -
> was reasonably proportionate to the need for force and did not inflict any serious
> injury. Indeed, the police video shows that Draper was standing up, handcuffed,
> and coherent shortly after the taser gun stunned and calmed him. The single use of
> the taser gun may well have prevented a physical struggle and serious harm to
> either Draper or Reynolds. Under the "totality of the circumstances," Reynolds's
> use of the taser gun did not constitute excessive force, and Reynolds did not
> violate Draper's constitutional rights in this arrest.

Draper, 369 F.3d at 1278.

The Court finds *Draper* to be distinguishable.  Lucas was not on the side of the road and

he was not being investigated for anything at the time of the first tasing.  Lucas was in his own

home, and the officers were there on a medical call involving someone who was combative with

emergency personnel.  By the time of the taser application, the emergency personnel were not in

the home and Lucas was refusing medical treatment.  Also, unlike Draper who was obligated to

produce at least his driver's license, the Court is not aware of authority that required Lucas to submit to a medical examination or that prohibited Lucas from ending the encounter by going to his own bedroom.  Further, although Lucas may have been angry and loud, he was not belligerent or confrontational to the officers.  Lucas was using profanity and was telling the officers to leave, but Lucas was not moving around actively like Draper did, Lucas was not accusing the officers of harassing him like Draper did, he was not complaining of conduct by the officers like Draper did (i.e. shining the flashlight in his eyes), and he did not act aggressively towards the officers like Draper did.  Finally, Reynolds was lawfully attempting to effectuate an arrest.  In this case, the officers have not established that probable cause existed to arrest Lucas, nor have they presented evidence that they were attempting to arrest Lucas.  Again, Esparza's declaration indicates that the taser was used to deal with an immediate physical threat posed by Lucas.  However, Lucas's deposition testimony is inconsistent with Esparza's version of events and does not indicate an immediate threat.

In *Mattos*, the Ninth Circuit explained in part, "[e]ven though the facts in *Mattos* are readily distinguishable from the facts in *Russo*, *Hinton*, and *Draper*, the violation was not so obvious that we can rely on the *Graham* factors and define the contours of clearly established law at a high level of generality."  Mattos, 661 F.3d at 452.  The facts of this case are different from *Mattos*, as explained above.  The basis for the taser application was not due to active resistence to an arrest.  The basis was that Lucas posed an immediate threat.  As discussed above, when viewed in the light most favorable to the non-moving party, only Lucas's angry and intoxicated state supports the use of force.  No crimes (or at best non-violent misdemeanors) were at issue, there was a less severe force option available, Esparza's conduct appears the more culpable, Lucas was not evading or resisting arrest, and, most importantly, Lucas was not an immediate threat to anyone.  To be sure, the law regarding taser use is developing.  However, the facts of excessive force in this case are clearer than in *Mattos*.  The Fourth Amendment jurisprudence was sufficiently clear in 2008 for an officer to know that it is improper to use any force on an individual who is in his own home, who is not posing an immediate threat to officers or to others, who is not being investigated for criminal activity, and who is not evading or resisting arrest.  Cf.

23

1  Fontana, 262 F.3d at 880 (holding that use of force when no force was justified violates the

2  Fourth Amendment).  Because the evidence indicates that no force was justified at the time of the

3  first taser application, and the facts of this case are distinguishable from *Draper*, *Brooks*, and

4  *Mattos*.  The Court finds that a reasonable officer would know that using a taser against Lucas

5  would violate his Fourth Amendment rights.  Qualified immunity for the first taser application

6  will be denied.

7                    b.    Second Taser Application

8        Qualified immunity for the second taser application is not as straightforward as the

9  analysis under the first taser application.  Lucas's resistence is similar to Mrs. Brooks's

10  resistence.  As described above, the officers were attempting to effectuate an arrest.  See Mattos,

11  661 F.3d at 437.  When the officers attempted to remove Brooks from her car, she stiffened her

12  body and grabbed the steering wheel in order to remain in her car.  See id.  In this case, Lucas

13  kept his hands under his stomach, despite commands to move his hands and O'Rafferty's

14  physical efforts to move Lucas's hands.

15        Although the type of resistence in *Brooks* is similar to this case, the officers in *Brooks* had

16  probable cause to arrest Mrs. Brooks for failing to sign the citation.  See id.  In this case, the

17  officers have not argued that they had probable cause to arrest Lucas for any offense, nor have

18  they explained when probable cause to arrest Lucas may have developed.  It is true that Lucas

19  pled guilty to the misdemeanor offenses of disturbing the peace (Penal Code § 415(2)) and public

20  intoxication (Penal Code § 647(f)).[10]  However, the Court cannot determine when probable cause

21  to arrest for these crimes may have developed.  Lucas was in his home at the time of the second

22  taser application,[11] and there is no evidence regarding how loudly Lucas was behaving

23  throughout the encounter.[12]  It is possible that probable cause developed for these offenses after

---

[10]A no contest plea implicates the concerns of *Heck v. Humphrey*, 512 U.S. 477 (1994).  See Szajer v. City of Los Angeles, 632 F.3d 607, 609-12 (9th Cir. 2011).  In the absence of some form of reversal or habeas corpus relief, Lucas cannot use a 42 U.S.C. § 1983 to challenge the issue of probable cause for his convictions.  See id.

[11]To be guilty violate Penal Code § 647(f), a person must be found intoxicate in a public place.  See People v. White, 227 Cal.App.3d 886, 891-93 (1991).  Presumably Lucas's residence is not a public place.

[12]Penal Code § 415(2) prohibits for a monetary fine and/or imprisonment for no more than 90 days for any "person who maliciously and willfully disturbs another person by *loud and unreasonable noise*."  (emphasis added).

the second taser application.  If probable cause to arrest developed before the second taser

application, then the Court would grant Esparza and O'Rafferty qualified immunity under

*Brooks*.  If probable cause developed after the second taser application, then *Brooks* would be

distinguishable.

In the absence of argument from the officers on the existence of probable cause at the

time of the second taser application, the Court will not hold that probable cause to arrest existed.

Without probable cause to arrest at the time of the second taser application, Lucas's resistence

has not been shown to be sufficiently similar to *Brooks* in order to justify qualified immunity.

For the same reasons that qualified immunity was inappropriate for the first taser application,

qualified immunity is inappropriate for second taser application.[13]


**II.      Fourth Amendment Claims Against The City**

*Defendant's Argument*

The City argues that there is no *Monell* liability.  First, Lucas's claim that the City does

not adequately train on the issue of using a taser on an individual who is refusing medical

treatment is without merit.  Esparza used the taser, not because Lucas was refusing medical

treatment, but because he was drunk, irate, violent, and caused her to be concerned for her safety

and the safety of others.  Second, as to using a taser on persons prone to episodic seizures, the

warnings issued by Taser only warned that a seizure could possibly happen and, if a seizure does

happen, then medical assistance should be obtained.  In this case, emergency personnel were

already on scene.  Third, the evidence establishes that the City trained, recertified, reviewed, and

reported its officers' taser use regularly.  There is simply no basis for *Monell* liability in this case.

*Plaintiff's Opposition*

Lucas argues that Esparza's conduct and use of her taser was unlawful.  Roger Clark has

---

[13]Trial in this case is set for September 10, 2013.  There is a settlement conference set for May 30, 2013.
The pre-trial conference is set for June 19, 2013.  Because of the importance of qualified immunity, the Court will
permit Defendants to file a second motion for summary judgment regarding qualified immunity for the second taser
application only.  Cf. Hoffman v. Tonnemacher, 593 F.3d 908, 909 (9th Cir. 2010) (district courts have discretion to
entertain successive summary judgment motions).  If this matter does not settle at the May 30 settlement conference,
Defendants shall thereafter promptly notify the Court whether they wish to file a second summary judgment motion.
If Defendants wish to file such a motion, the Court will move the pre-trial conference and set a briefing schedule.

opined that the City failed to provide the necessary training and administrative enforcement that would have prevented the departures from professional standards that occurred.  There are no policies informing officers on how to deal with medical emergencies, on how to recognize someone who recently suffered a seizure, or on using a taser on someone who may be having medical issues.  Clark also noted that the City's taser reports show that from 2007 to 2009 the City's officers used tasers more than 200 times.  Ronald Epp, one of the City's Rule 30(b)(6) Person Most Knowledgeable witnesses, was unwilling to concede that the term "taser overdependence" included using less forceful means when dealing with the public.  This illustrates a custom and practice of excessive force with the City.  Further, Clark opines that the City's failure to conduct any meaningful investigation of the incident sent a clear message to officers to ignore POST standards and citizens' rights.

Additionally, Lucas states that discovery has not closed and he is trying to obtain information that could be essential to *Monell* liability.  Specifically, he is trying to obtain the Esparza and O'Rafferty's personnel files in order to determine whether there are other instances of excess force or unlawful entry.  Summary judgment on this issue should be reserved.

### *Legal Standard*

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984.  Municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the 'standard operating procedure' of the local

government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. See Price v. Sery, 513 F.3d 962, 966 (9th Cir. Or. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85; Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995). A "policy" is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008); Long, 442 F.3d at 1185. A "custom" for purposes of municipal liability is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law. St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir. 1990). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918; see also McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000); Thompson v. Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989). After proving one of the above theories of liability, the plaintiff must show that challenged municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation. See Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008); Trevino, 99 F.3d at 918.

*Discussion*

The active complaint in this case is the Third Amended Complaint ("TAC"). See Doc. No. 54. The TAC alleges essentially two theories of *Monell* liability: (1) a policy or practice of condoning excessive force through improper supervision, investigation, discipline, and monitoring, see TAC ¶¶ 28-31; and (2) a failure to adequately train officers regarding use of the taser, including using it on someone suspected of having medical problems and/or someone who is refusing medical care. See TAC ¶¶ 32, 33, 34. The Court will discuss these two theories separately.

1

        a.      Condoning Excessive Force

2          There is no evidence that the City's written  policy on excessive force is improper, and

3   there is a written policy that requires that a warning be given before using a taser, unless giving a

4   warning is impractical.  See PUMF 28.  The evidence further establishes that product warnings

5   from Taser International were distributed and discussed, and the City required their officers to be

6   certified and recertified in taser usage.  See PUMF 30, 35.  Importantly, the evidence shows that

7   the City requires that a Taser Use Report be filled out every time a taser is used, even if only the

8   laser sighting mechanism is all that is used.  See PUMF 36.  The City's established practice was

9   that each Taser Use Report was reviewed by the Police Standards Lieutenant in order to

10  determine whether the use was proper or whether discipline, correction, or change in policy

11  should occur.  See PUMF 39.  A Taser Use Report was filled out and reviewed in connection

12  with Esparza's use of her taser, and the use was found to be within policy.  See PUMF's 36, 37.

13  This evidence shows that the City ensured that its officers were trained, were current in

14  certification, and that every use of a taser, even when no electrical discharge occurred, was

15  reviewed and monitored.  The evidence shows a concern and awareness about taser use by the

16  City; it does not reflect deliberate indifference.

17         Lucas points to Policy No. 300.5, regarding "Supervisor Responsibility."  That section

18  requires a supervisor to initiate an internal administrative investigation if the supervisor

19  determines that a use of force was not within policy.  See Lynn Depo. 78:12-82:19.  The same

20  policy states that, when a supervisor responds to an incident where force was used (including

21  taser deployment), the supervisor is required to complete a potential claim form if he believes

22  that civil litigation is possible.  See id.  There were no investigations, other than a review of the

23  Taser Use Report, that occurred in this case.  See PUMF's 65, 76; DUMF's 37, 38.  Roger Clark

24  also is critical over a lack of investigation concerning Esparza's taser use.  See Clark Dec. ¶ 17.

25  However, simply because no internal investigations occurred is not a sufficient basis for *Monell*

26  liability.  First, the terms of Policy No. 300.5 clearly provide for mandatory internal

27  investigations.  Lucas does not complain about the express terms of Policy 300.5.  Second, that

28  Policy 300.5 may not have been followed in this particular case does not show that the policy is

routinely ignored or that there is another custom at play. It is clearly established that a "custom" is a longstanding and widespread practice, and that a custom is not shown by pointing to sporadic or isolated incidents. See Trevino, 99 F.3d at 918. By focusing on the decision not to investigate in this case, as well as the conduct in this particular case, Lucas is only pointing to inadequate, isolated incidents. The singular events of this case do not reflect a custom. See id. Third, that a Lieutenant did not find a violation of policy in this particular case does not show ratification. There is no evidence that the Lieutenant has any policy making authority, and the mere failure to overrule a subordinate's decision, without more, does not show ratification.[14] See Lytle, 382 F.3d at 987; Trevino, 99 F.3d at 920.

Lucas and Clark also contend that Epp's description of the term "taser overdependence," combined with 200 taser uses by City police officers from 2007 to 2009, illustrates a custom and practice of excessive force. With respect to the term "taser overdependence," Lucas is critical that Epp did not acknowledge that the term encompasses a failure to use less restrictive means when dealing with public. However, the term "taser overdependence" is part of a training program from Taser International. See Epp Depo. 144:20-146:3. Epp was asked for his understanding of that term from his training. See id. Epp replied that the term referred to a belief that the taser can solve all problems, and that officers should not overestimate the taser's capabilities. See id. at 145:4-9. Lucas's counsel asked if there are situations whereby a department could become "taser overdependent" and then forego using less forceful methods. See id. at 145:10-13. Following an objection, Epp responded that he could not answer the question. See id. at 145:14-20. Epp was then asked whether the training at Taser International included an explanation that there are situations where less forceful methods can be used instead of a taser, to which Epp responded "no." See id. at 145:21-146:3. The context of Epp's responses deal with a particular term used by Taser International and how that term was used or explained during training at Taser International. Epp simply repeated what occurred at that training, and there has been no evidence presented that Epp's understanding of that Taser

---

[14]It is noteworthy that the Taser Use Report filled out by Esparza and reviewed by Edward Lynn indicated that Lucas clinched his fist and lunged forward. See Lynn Dec. Ex. B.

1   International training term is incorrect.  Without more, that Epp did not agree that the term as

2   described during training did not included other concepts is irrelevant.  With respect to the 200

3   taser uses over a three year period, Clark declares that this averages out to approximately 5 taser

4   uses per month, which he says is excessive.  See Clark Dec. ¶ 15.  However, Clark offers no

5   specifics regarding the circumstances of the taser uses, does not opine that any of the 200 taser

6   uses were actually excessive or improper, does not compare the taser use figures in the City to

7   any other communities that have roughly similar populations and crime statistics, and Clark does

8   not explain what knowledge or experience he possess that would permit him to opine that 200

9   taser uses over a 3 year period in a town like the City is excessive.  Clark's opinion concerning

10  the 200 taser uses is nothing more than an unreliable and unsupported *ipse dixit* opinion.  See

11  Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002).  The 200 taser uses does not aid Lucas.

12       Lucas has not criticized any of the City's formal written policies.  Further, those policies

13  do not reflect any deliberate indifference towards taser usage.  Lucas's reliance on a review by

14  the single Lieutenant, as well as the facts of this single incident, are insufficient to establish a

15  custom of condoning excessive force.  Further, Lucas's characterization of Epp's deposition

16  testimony is not accurate, and his reliance on Clark's unsupported opinion regarding 200 taser

17  uses does not create a triable issue of fact.  Summary judgment in favor of the City on this

18  *Monell* theory is appropriate.[15]

19              b.    Failure To Train

20       Part of Lucas's claims are based on a product warning distributed by Taser International.

21  See TAC ¶¶ 32-33.  The warning from Taser International reads:  "Seizure Risks: Repetitive

22  stimuli such as flashing lights or electrical stimuli can induce seizures in some individuals.  This

23  risk is heightened if electrical stimuli or current passes through the head region."  DUMF 29.

24

25       [15] Lucas indicates that the parties are in the midst of a discovery dispute regarding the personnel files of
O'Rafferty and Esparza.  Lucas requests that the Court withhold a ruling until the discovery dispute is resolved.

26  However, the discovery dispute should have been resolved some time ago.  At no time since Lucas filed his
opposition has he attempted to supplement his opposition with evidence from O'Rafferty's or Esparza's personnel

27  file.  The Court finds it likely that if something advantageous were in the files, then such evidence would have been
submitted for review before now.  Nevertheless, if Lucas has obtained new evidence from the officers' personnel

28  files, and he has a good faith belief that the new evidence would compel a different result, then Lucas may file a
motion for reconsideration based on the new evidence from the personnel files.  The motion may be filed within ten
(10) days of service of this order.

Contrary to Lucas's assertions, this particular warning was part of the training that all officers, including O'Rafferty and Esparza, received from the City. See DUMF 30; Epp Dec. 2:28-3:12 & Exs. D, E. There is no evidence that this warning was not properly discussed or that the City's training with respect to this warning is deficient.[16] Summary judgment is appropriate for any *Monell* claims based on the failure to include the Taser International "Seizure Risk" warning, or the adequacy of teaching that warning.

However, the City produced two Person's Most Knowledgeable regarding the City's training and policy manuals – Epp and Edward Lynn. Lynn testified that he was not aware of City training materials that address situations in which officers can use force in a medical call situation, nor was he aware of policies that address how officers are to respond when a person refuses medical treatment. See Lynn Depo. 85:6-16; PUMF 73. Lynn was unaware of any training on how to recognize certain medical conditions, such as seizures or diabetic shock, or how to deal with someone who has had a seizure. See Lynn Depo. 85:20-86:10. Similarly, Epp testified that he did not recall any training materials on using a taser on someone in a medical aid call, on someone who might have had a seizure or be complaining about seizures, or on people who refused medical treatment. See Epp Depo. 114:21-115:14. Clark has declared in part: ". . . [the City] does not have policies or training manuals relating to how to deal with a medical emergency, how to recognize someone who has recently suffered from a seizure, or how to use a taser on someone who might be having medical issues. It is my opinion that these topics are necessary and required for a police officer's curriculum." Clark Dec. ¶ 12. In essence, this evidence shows an absence of training regarding how officers are to behave when they respond to a medical aid call.

This case reflects that the City dispatches its police officers in support of "medical aid" calls.[17] In a "medical aid" call situation, it is foreseeable that police officers will deal with

---

[16]To the extent that Lucas may rely on Esparza's actions in this case, they are insufficient to establish constitutionally inadequate training. See City of Canton v. Harris, 489 U.S. 378, 391 (1989) ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable.").

[17]O'Rafferty classified this incident as a "medical call," and in the Taser Use Report, Esparza classified the incident type as "medical aid." See O'Rafferty Dec. 2:13; Lynn Dec. Ex. B.

individuals who are upset, who do not want to receive medical treatment, and who do not want personnel to be present.  Although there certainly may be overlap, it would seem that the concerns inherent in a medical aid call would not necessarily be the same as the concerns in a "criminal investigation" call.  Clark's declaration accepts this distinction when he criticizes the officers because they "addressed the situation as if Mr. Lucas was suspected of criminal behavior, rather than accurately viewing the situation as a medical issue."  Clark Dec. ¶ 10.  To be sure, the City contends that Lucas was not tased because he was refusing medical treatment.  However, Lucas's position, that the officers should have left when Lucas refused treatment and were ordered all to leave, is not unreasonable, especially when the emergency personnel were out of the residence.[18]  If the officers had respected Lucas's refusal for treatment and left the residence at any one of Lucas's many requests, Esparza would not have used her taser.

There appears to be no training regarding when force may be used in a medical aid call, whether it is appropriate to use a taser on someone who may be having medical problems, and how to deal with an individual who is refusing medical treatment.[19]  Given that City officers respond to medical aid calls, and considering that a different dynamic is likely to be involved in medical aid calls than in criminal investigation calls, a reasonable jury could find the absence of such training reflects deliberate indifference.  Summary judgment on this theory of *Monell* liability will be denied.

### **3.**   **Assault & Battery, Intentional Infliction of Emotion Distress, Negligence, & Civil Code § 52.1**

Defendants move for summary judgment on these state law claims because they contend

---

[18]Without more, the evidence does not necessarily require a reasonable jury to conclude that Lucas posed a danger to Monpere.  Lucas's cursing, yelling, and frustration/anger were all directed at the conduct of the emergency personnel and police officers.  Specifically, the failure to accept that Lucas was refusing treatment and that all personnel needed to leave.  Nothing that Lucas did was directed in any way towards Monpere.

[19]To be clear, the Court is not holding that police officers are to receive paramedic training.  If a police officer either promptly summons medical assistance or takes an injured arrestee for medical treatment, then the officer meets his constitutional obligations.  See Walker v. Fresno Police Dept., 249 Fed. Appx. 525, 526 (9th Cir. 2007); Tatum v. City & County of San Francisco, 441 F.3d 1090, 1099 (9th Cir. 2006).  The Court is merely holding that, based on the evidence presented, there appears to be a different dynamic in a medical aid call.  The absence of training concerning that different dynamic is problematic.

that Esparza's use of force was reasonable and lawful under the Fourth Amendment.  However, as discussed above, there is a triable issue of material fact as to the reasonableness of Esparza's taser use.  Thus, summary judgment on these claims will be denied.

### 4.      Civil Code § 51.7

*Defendants' Argument*

Defendants argue that there is no evidence that the officers' motivation for the conduct was due to Lucas's membership or perceived membership in a protected class.  The officers used the taser and strapped Lucas to a gurney because he was big, violent, and drunk, and his conduct caused Esparza to fear for her safety and the safety of others.

*Plaintiff's Opposition*

Lucas argues that courts recognize that police officers may be liable for discrimination where they wrongly arrest a disabled person due to the effects of the disability, especially where the officers had reason to know of the disability.  Here, the officers knew or should have known that Lucas had a medical condition.  Despite knowing that Lucas was having seizures, they refused to properly communicate with Lucas or acknowledge his medical condition, and ultimately arrested him because of his lawful conduct related to his disability.

*Legal Standard*

California Civil Code § 51.7 "declares that all persons have the right to be free from violence or intimidation because of their race, color religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because they are perceived by another to have any of these characteristics."  Venegas v. County of Los Angeles, 32 Cal.4th 820, 841 (2004); see also Corales v. Bennett, 567 F.3d 554, 570-71 (9th Cir. 2009).  The statute requires a plaintiff to "present evidence of 'violence, or intimidation by threat of violence,' committed against Plaintiffs on the basis of a protected ground."  Corales, 567 F.3d at 571.  If there is no evidence that a defendant's conduct was motivated by or because of a bias or animus against a protected group, then there is no liability under § 51.7.  See Austin B. v. Escondido Union Sch. Dist., 149 Cal.App.4th 860, 881 (2007).

*Discussion*

The Court will assume, as the parties also seem to assume, that Lucas is considered "disabled" because of his seizure disorder. So assuming, there is no evidence that Esparza's motivation in using her taser against Lucas was an animosity or bias against individuals with seizure disorders. See Austin B., 149 Cal.App.4th at 881. Lucas has not presented evidence of any statements by Esparza relating to seizure disorders or other disabilities, or any other evidence that reasonably links the use of the taser to a bias or animus against those who are disabled like Lucas. Lucas has only shown that he has a disability and was tased by Esparza. That evidence is insufficient. See id.; cf. Bingham v. City of Manhattan Beach, 341 F.3d 939, 948-49 (9th Cir. 2003) (holding no equal protection clause violation when only evidence of discrimination is that parties are of a different race and there is a disagreement as to the reasonableness of conduct).[20]

Lucas relies on two federal cases applying Title II of the Americans with Disabilities Act to arrest situations. Lucas has not shown that Title II cases should be used to interpret § 57.1 cases. Assuming without deciding that California courts would look to Title II cases in evaluating § 57.1(a) cases based on disability, the cases cited by Lucas are distinguishable.

In *Lewis v. Truitt*, 960 F.Supp. 175, 176 (S.D. Ind. 1997), officers refused to believe that plaintiff Lewis was deaf, despite repeated representations by others and an offer to show a teletype telephone system. The defendants did not attempt to write questions or instructions. See id. at 176. The defendants tackled and beat Lewis, and then arrested him for "resisting law enforcement." See id. The Indiana court denied summary judgment on the Title II claim because Lewis had presented uncontradicted evidence that the defendants knew Lewis was deaf, refused to take steps to communicate with him, and then arrested Lewis when he did not respond appropriately. See id. at 178-79. In this case, however, there is no evidence that Lucas could not understand Esparza or that Esparza knew that Lucas's seizure disorder was preventing him from understanding or responding appropriately.

In *Jackson v. Inhabitants of the Town of Sanford*, 1994 U.S. Dist. LEXIS 15367 (D. Me.

---

[20] *Bingham* was abrogated on other grounds. See Edgerly v. City & County of San Francisco, 599 F.3d 946, 956 n.14 (9th Cir. 2010).

Sept. 23, 1994), plaintiff Jackson had suffered a stroke that left him with physical difficulties, including partial right side paralysis and slurred speech.  Jackson was arrested on suspicion of driving under the influence, even though Jackson informed the arresting officer of the effects of the stroke.  Summary judgment against the city on Jackson's Title II claim was denied.  The city had argued that Title II was inapplicable and that the Fourth Amendment reasonableness standard applied.  The district court rejected that argument based on the legislative history of Title II.  The District of Maine has since explained that the type of discrimination in *Jackson* is a type of disability discrimination that occurs when the police wrongly arrest an individual because the police misperceive the effects of a disability as criminal activity.  Buchanan v. Maine, 417 F.Supp.2d 45, 72 (D. Me. 2006).  Here, Lucas was not suffering a seizure in front of Esparza. Lucas went up the stairs, was turning around, and then was tased.  Lucas has not identified the accepted sequella of his seizure disorder, nor has he explained how Esparza misperceived those sequella for either a crime or dangerous conduct.

Lucas has failed to show that Esparza's use of the taser was motivated by an animus or bias against those who are disabled like Lucas.[21]   Summary judgment on this claim is appropriate.[22]  Austin B., 149 Cal.App.4th at 881.

### 5.    Negligent Infliction of Emotional Distress ("NIED")

Defendants argue that the NIED cause of action is merely alleging a type of damages for negligence, but is otherwise duplicative of the seventh cause of action for police negligence. Lucas did not respond to this argument.  It appears to the Court that the NIED and negligence causes of action largely overlap.  In the absence of an argument from Lucas that defends his NIED cause of action, the Court will accept Defendants' reading of the NIED claim.  See Jenkins

---

[21]Lucas did not identify the violent conduct at issue for this cause of action.  However, the only violent conduct that is apparent to the Court is the use of the taser by Esparza.  To the extent that Lucas may be complaining about being strapped to the gurney, that conduct does not violate § 51.7.  Lucas does not dispute that he was strapped to the gurney after he began struggling.  See Plaintiff's Response to DUMF's 24, 25.  Thus, Lucas was strapped to the gurney because he was struggling, not because he had a disability.  Cf. Austin B., 149 Cal.App.4th at 881.

[22]Because § 51.7 was not violated by the officers, the City cannot be vicariously liable.  See J.P. v. City of Porterville, 801 F.Supp.2d 965, 990 n.25 (E.D. Cal. 2011); Lathrop v. Healthcare Partners Med. Grp., 114 Cal.App.4th 1412, 1423 (2004).

v. County of Riverside, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005).  Summary judgment will be granted on the NIED claim in so far as it is a separate cause of action.  However, Lucas may pursue the damages described under the NIED claim through his seventh cause of action.


**CONCLUSION**

Summary judgment and qualified immunity on the first cause of action are inappropriate because, viewed in the light most favorable to Lucas, no use of force was justified against Lucas at the time Esparza deployed her taser.  For the same reasons, summary judgment is inappropriate on the related state law claims for assault and battery, intentional infliction of emotional distress, negligence, and Civil Code § 52.1.  Summary judgment is appropriate on the *Monell* claims based on "condoning excessive force" and on the Taser International "Seizure Risk" warning because Lucas has failed to show a policy or custom that amounts to deliberate indifference.  However, summary judgment on *Monell* claims based on the failure to train officers regarding "medical aid calls" is inappropriate because the evidence indicates no training on this subject.  Summary judgment on the Civil Code § 51.7 claim is appropriate because there is no evidence that the officers' conduct towards Lucas was due to a bias against his disability.  Finally, summary judgment on the NIED claim will be granted because the cause of action is duplicative.


**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendants' motion for summary judgment is DENIED as to Plaintiff's first cause of action, second cause of action for "medical aid calls," third cause of action, fourth cause of action, fifth cause of action, and seventh cause of action;

2.  Defendants' motion for summary judgment is GRANTED as to Plaintiff's second cause of action for "condoning excessive force" and Taser International product warnings, Plaintiff's sixth cause of action, and Plaintiff's eighth cause of action.

IT IS SO ORDERED.

Dated:   May 7, 2013                                _____
                                                                        SENIOR  DISTRICT  JUDGE