IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JESSE RAY LUCAS, | ) | 1:09-CV-1015  AWI JLT |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER ON DEFENDANTS' MOTION FOR SUMMARY |
| CITY OF VISALIA, et al., | ) ) | JUDGMENT |
| Defendants. | ) ) ) | (Doc. No. 97) |

    This is an excessive force case that arises out of a confrontation between Plaintiff Jesse Lucas ("Lucas") and members of the City of Visalia Police Department.  This Court previously granted in part and denied in party a motion for summary judgment by Defendants.  In that order, the Court indicated that it would permit a second summary judgment motion on the limited issue of qualified immunity for officer Carmen Esparza's ("Esparza") second taser application. Defendants filed their second summary judgment motion.  After reviewing the arguments and evidence presented, the Court will deny qualified immunity.

**FACTUAL BACKGROUND**[1]

    On May 1, 2008, Elise Monpere ("Monpere"), Lucas's then girlfriend and now wife, called 911 for medical assistance for Lucas.  See DUMF 2.  Firefighters and ambulance personnel arrived at Lucas's apartment, and Monpere let the firefighters and paramedics inside where they conferred with Monpere and Lucas.  See DUMF 4; PUMF 5; Monpere Depo. 52:21-

---

[1] "DUMF" refers to Defendants' Undisputed Material Facts, and "PUMF" refers to the Plaintiff's Undisputed Material Facts that were submitted with the first summary judgment motion.  With the exception of three additional new facts, Defendants' proposed undisputed material facts are identical to the facts they submitted with their first summary judgment motion.  Because of Defendants' heavy reliance on the facts submitted with the prior motion, the Court will mainly use the factual background established during the first summary judgment motion.

53:23, 69:9-19. Lucas had drunk 4 to 7 beers earlier that evening and was intoxicated when the firefighters and paramedics arrived. See DUMF's 3, 5. Lucas repeatedly refused medical treatment and told the firefighters and paramedics that he did not want them there and that he did not call for their assistance. See Krauss Depo. 33:12-36:12. Lucas was using profanity and was adamant that the personnel needed to leave and that he did not want any help. See id. at 34:22-36:3. The emergency personnel requested police assistance at Lucas's residence. See PUMF 7.

Esparza and O'Rafferty were dispatched to the scene in response to the request for officer assistance from the firefighters and paramedics. DUMF 7. That is, the officers were dispatched to assist with a "medical call." O'Rafferty Dec. 2:13. The officers received information from dispatch that a 24 year old male was having seizures. See PUMF 8. The officers were also told by dispatch that Lucas was combative with the firefighters and paramedics. DUMF 8.

O'Rafferty arrived at the scene first. PUMF 9. As he approached the home, O'Rafferty could see medical personnel outside, huddled around the doorstep outside the home, and could see Lucas sitting on a staircase just inside the front door talking to medical personnel. PUMF 10. O'Rafferty observed Lucas in angry conversation with other paramedics, and heard Lucas say that he did not want any help. See PUMF's 13, 14. O'Rafferty also observed that Monpere was at the rear of the house away from where Lucas was sitting. See PUMF 18. Paramedics told O'Rafferty that Lucas had hit a wall in the home, and O'Rafferty does not recall seeing that incident. See PUMF 15.

O'Rafferty entered Lucas's home. See O'Rafferty Depo. 77:5-12. O'Rafferty explained to Lucas that medical personnel were there to try and help and there was concern that Lucas was mentally altered and intoxicated. See O'Rafferty Depo. 62:9-22. Lucas became more agitated and continued to insist that all personnel leave. See PUMF 21.

Although Lucas began to calm down a bit, Esparza then arrived, which caused Lucas to become more agitated. See PUMF's 23, 24. Esparza could hear Lucas object to O'Rafferty being in the home, and could see both that Lucas was not in medical danger, and that Monpere was not physically harmed. See PUMF 25. Esparza did not see any emergency personnel inside the home, and it was her impression that all emergency personnel were outside. See PUMF 26;

Esparza Depo. at 57:7-10.  Esparza entered Lucas's home.  See PUMF 27.

Lucas clearly told both Esparza and O'Rafferty that he refused medical treatment and requested that all personnel leave his home.  See PUMF 28.  Lucas cursed at the officers and emergency personnel.  See DUMF 9.  The longer the officers and personnel were present, the angrier and angrier Lucas became.  See Lucas Depo. 80:24-81-9.  Lucas then turned and began to walk up the stairs and said that he was going to bed and that they all needed to leave.  See PUMF 29.  Esparza clearly heard Lucas say this.  See id.  Lucas continued to curse as he went up the stairs.  See DUMF 11.

Esparza and O'Rafferty were concerned for the safety of everyone in the residence, including Lucas and Monpere, and so followed Lucas up the stairs.  See DUMF 12; PUMF 31.  Esparza was the first officer behind Lucas as they went up the stairs, and O'Rafferty followed behind Esparza.  See DUMF's 14, 15.  Lucas is 6' 1" and weighs 210 lbs., Esparza is 5' 1" and 115 lbs., and O'Rafferty is 6' 6" and 230 lbs.  See DUMF 1; Esparza Dec. at 1:28; O'Rafferty Depo. 9:18-20.  Lucas said nothing about getting a weapon and made no threats to the officers, and there had been no mention of weapons by Lucas or anyone on site.  See PUMF 30; O'Rafferty Depo. 119:5-22.  Lucas did not make any verbal threats or physically assault anyone in the residence.  See PUMF 34.  At no point during the incident did Lucas yell at Monpere.  See Monpere Depo. 56:5-8.  Further, Esparza testified that she believed that all emergency personnel were outside the residence, and she did not know where Monpere was.  See PUMF 62.

When Lucas reached the top of the stairs, he was turning around.  See Lucas Depo. 123:18-124:7.  Esparza believed that Lucas was adopting an aggressive stance when he turned around.  DUMF 17.  Lucas testified that he was not aggressive towards the officers, and that he was tased as he was facing away from the officers and turning around.  See Lucas Depo. 79:18-80:7, 234:3-10.  Esparza did not give Lucas a warning before deploying the taser.  See PUMF 36; Doc. No. 97-1 at 11:19-21.  The taser darts struck Lucas in the stomach area (in the upper-stomach right of center area and in the waist right of center area).  See DUMF 18; Esparza Dec. 3:25-27.  Lucas fell to the ground.  See DUMF 19.  Sometime prior to the first taser application, but before he began turning around, Lucas was shouting or speaking very loudly, "Get the fuck

3

out of the house." Lucas Depo. 80:7-23.  Before this taser application, Lucas used the word "fuck" between forty and fifty times.  Id. at 76:25-77:15.

O'Rafferty attempted to roll Lucas over and handcuff him.  See O'Rafferty Depo. 89:23-90:1; Esparza Depo. 79:2-15.  Esparza then told Lucas to roll onto his stomach and put his hands behind his back.  DUMF 20.  Lucas's body was somewhat tense, his upper body was flexed, and it seemed as though he was keeping his hands underneath him and away from O'Rafferty.  See O'Rafferty Depo. 89:1-12; Esparza Dec. at 4:3-4.  O'Rafferty testified that it was a "struggle" to handcuff Lucas and that Lucas was resisting him.  See O'Rafferty Depo. 90:2-6, 91:10-15.  Esparza told Lucas several more times to put his hands behind his back, but Lucas did not comply.  See Esparza Dec. at 4:3-5.  In order to gain compliance, Esparza cycled the taser a second time.  See PUMF 41; DUMF 22.  Esparza testified that a warning was given.  See Esparza Depo. 81:8-19.  Lucas complied with the directions to place his hands behind his back after Esparza cycled the taser a second time.  See DUMF 23.

Lucas was then placed on a gurney and began to struggle again.  See DUMF 24.  Lucas was strapped to the gurney, and taken to Kaweah Delta Hospital for treatment.  See DUMF's 25, 26.  After treatment, Lucas was taken to jail.  See PUMF 45.

Esparza charged Lucas with violations of Penal Code sections 148 (hindering a police officer/resisting arrest) and Health and Safety Code § 11550 (being under the influence of a controlled substance), but the District Attorney either added or substituted charges under Penal Code sections 415(2) (disturbing the peace) and 647(f) (public intoxication).  See Esparza Depo. 83:6-85:19; Lucas Depo. 83:21-84:1; PUMF 47.  Lucas pled "no contest" to the public intoxication charge and the disturbing the peace charge.  See Lucas Depo. 84:2-4, 85:14-19.

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

4

judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire, 210 F.3d at 1102-03. If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d

1061, 1065 (9th Cir. 2003). However, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1058 (9th Cir. 2009); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

## DEFENDANTS' MOTION

### I.     Fourth Amendment Claims Against Officers

*Defendants' Argument*

Defendants argue that the undisputed facts show there was probable cause to arrest Lucas for violation of Penal Code § 415(2) at the time of the second taser application. Lucas admitted that he was shouting or speaking in a very loud voice, so he was making loud noise. The noise was willful and malicious because he was growing increasingly angry as the incident progressed. Lucas's conduct disturbed others in that it caused the officers to be concerned about their safety and the safety of others and prompted the firefighters to call for police backup. Lucas had punched a hole in the wall, was angry, and was using profanity. His angry, violent, vulgar and loud words were unreasonable. With probable cause to arrest, the facts are similar to the *Brooks* portion of the consolidated opinion in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011).

Additionally, in the *Mattos* portion of *Mattos v. Agarano*, qualified immunity was given to officers who tased the cooperative Mrs. Mattos, who was trying to be helpful, but then pushed away an officer who was pressed against her breasts. Mrs. Mattos was not arrested or charged with a crime and the Ninth Circuit found any violation of law by her to be minimal. Mattos's conduct was defensive and intended to only protect her own body from contact. If qualified

immunity was given in 2011 for tasing Mattos, then qualified immunity should be given for the tasing of the 6 foot, 200 lbs. Lucas, who had been violent to property, and was angry and loud.

*Plaintiff's Opposition*

Lucas argues that there was not probable cause to arrest him under Penal Code § 415(2). Lucas did not make any verbal threats towards the medical personnel or the officers, but he was simply very adamant about not wanting people in his home. It is consistent with the First Amendment to insist that illegally present personnel leave one's home. Lucas argues that he had no obligation to comply or cooperate with any personnel who were within his home illegally.

Lucas argues that the *Mattos* portion of *Mattos v. Agarano* is inapplicable because the officers there met the requirements for a warrantless entry. There were exigent circumstances and the officers were dealing with a domestic violence call. More officers are injured during domestic violence calls than any other type of call. Here, the entry into the home was not justified and the officers were not present in response to domestic violence call.

*Legal Standard*

Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th Cir. 2006). The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces." Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).

A court employs a tiered analysis for determining qualified immunity. See Saucier v. Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th Cir. 2006); Brittain, 451 F.3d at 987. However, lower courts need not strictly follow the tiered sequence in analyzing qualified immunity, but instead may dispose of the issue at step two without addressing step one. Pearson v. Callahan, 555 U.S. 223 (2009); Moss v. United States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009). Under the first step, the court determines

whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201; Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229. If the answer is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis. See Saucier, 533 U.S. at 201; Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).

Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988. The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079. Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Skoog, 469 F.3d at 1229-30. In making this determination, the court considers the state of the law at the time of the alleged violation, but it is unnecessary for the precise conduct in question to have been previously held unlawful. See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir. 2000). Further, the court considers the "information possessed" by the officer at the time of his conduct. See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th Cir. 2007). If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001). As a wholly objective inquiry, see Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . .irrelevant." Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641. Thus, qualified immunity applies if "a reasonable officer could have believed [the action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed." Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.

*Discussion*

    a.       Immunity Based On The Facts Of *Brooks v. City of Seattle*

In the first summary judgment order, the Court found that the facts in *Brooks v. City of Seattle* portion of *Mattos v. Aragano* were similar to the facts in this case. Seattle police officers were attempting to arrest Mrs. Brooks because she refused to sign a traffic citation. See Mattos v. Aragano, 661 F.3d 433, 437 (9th Cir. 2011). Mrs. Brooks resisted arrest by disobeying orders to exit her vehicle, not exiting despite her arm being placed behind her back, and grabbing the steering wheel and stiffening her body so that the officers could not remove her. See id. Brooks did not comply with commands, and did not heed warnings that a taser would be used. See id. Brooks was then tased repeatedly until the officers were able to remove her from her vehicle. See id. Although the Ninth Circuit found a constitutional violation, in light of cases such as *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the officers were entitled to qualified immunity for using their taser on a non-cooperative and resistant individual in order to effectuate an arrest supported by probable cause. See id. at 447-48.

In this case, Lucas fell on his stomach after he was tased the first time. O'Rafferty then attempted to roll Lucas over so that he could handcuff Lucas. Lucas kept his hands under his stomach and was resisting O'Rafferty's efforts to roll him over. Lucas did not comply with commands, and Esparza warned Lucas that he would be tased again if he did not roll over. After the second taser application, Lucas rolled over and was handcuffed.

The level and type of resistance by Mrs. Brooks and Lucas are very similar. Because the type of resistance displayed by Brooks was so similar to this case, the Court indicated in the prior summary judgment order that it would have granted qualified immunity to the officers if they had shown probable cause for an arrest prior to the second tasing.[2] However, because Defendants did

---

[2] Lucas states that the relevant time frame is the time between the first and second taser applications. The Court disagrees. The relevant time frame for probable cause is any time prior to the second tasing. The totality of the circumstances are viewed in determining probable cause, John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008), which would include the time before the first tasing. Although the officers were not trying arrest Lucas at the time of the first tasing, that does not necessarily mean that probable cause to arrest did not exist or that facts prior to the first tasing cannot be considered. Further, even if probable cause existed prior to the first tasing, that would not entitle the officers to qualified immunity for the first tasing. Penal Code § 415(2) is a misdemeanor offense, Lucas was not fleeing from arrest or resisting, and Lucas was not an imminent danger to anyone. Even with probable cause for an arrest, a reasonable officer could not think that the first tasing was lawful.

9

not discuss probable cause, summary judgment was denied. Now, Defendants argue that probable cause to arrest Lucas under Penal Code § 415(2) existed prior to the second tasing.

Penal Code § 415(2) provides that, "[a]ny person who maliciously and willfully disturbs another person by loud and unreasonable noise" shall be punished by imprisonment of 90 days or less, a fine of $400 or less, or both. Cal. Pen. Code § 415(2). The term "'maliciously' import[s] a wish to vex, annoy, or injure another person or an intent to do a wrongful act . . . ." Rosenbaum v. City & County of San Francisco, 484 F.3d 1142, 1162 (9th Cir. 2007); see also Judicial Council of Cal., Crim. Jury Instructions ("CALCRIM") § 2689. Acts that are "willfully" done are acts that are done "willingly or on purpose." CALCRIM § 2689. Shouting constitutes "the loud 'noise' prohibited by [§ 415] in only two situations: (1) where there is a clear and present danger of imminent violence, and (2) where the purported communication is used as a guise to disrupt lawful endeavors." In re Brown, 9 Cal.3d 612, 621 (1973); see Hampsmire v. City of Santa Cruz, 899 F.Supp.2d 922, 930 (N.D. Cal. 2012). "The use of the human voice to disturb others by the mere volume of the sound when there is no substantial effort to communicate or when the seeming communication is used as a guise to accomplish the disruption may be prohibited [under § 415]." Rosenbaum, 484 F.3d at 1161-62; In re Brown, 9 Cal.3d at 621.

Lucas pled no contest to the § 415(2) charge. See Lucas Depo. 85:14-19. A no contest plea implicates the concerns of *Heck v. Humphrey*, 512 U.S. 477 (1994). See Szajer v. City of Los Angeles, 632 F.3d 607, 609-12 (9th Cir. 2011). If a criminal conviction or sentence has not been reversed, overturned, or otherwise invalided, *Heck* bars a § 1983 claim where the judgment would "necessarily imply the invalidity of a conviction or sentence." See Heck, 512 U.S. at 487. "*Heck*, in other words, says that if a criminal conviction arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which [§ 1983] damages are sought, the [§ 1983] action must be dismissed." Smithart v. Towery, 79 F.3d 951, 952 (9th Cir. 1994). If a § 1983 lawsuit will not necessarily demonstrate or imply the invalidity of a criminal conviction, then the § 1983 lawsuit may proceed. See Heck, 512 U.S. at 487; Hooper v. County of San Diego, 629 F.3d 1127, 1130-31 (9th Cir. 2011). Here, there is no indication that Lucas's

10

conviction has ever been reversed or overturned. As a result, Lucas is prohibited from pursing any cause of action that would essentially deny probable cause for the § 415(2) conviction.[3] See Szajer, 632 F.3d at 612; Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998); Smithart, 79 F.3d at 952. The question then arises at what point in time did probable cause exist for a violation of § 415(2).

Defendants have cited evidence that describes Lucas's conduct prior to the second tasing. This evidence indicates that Lucas was loud, angry, and profane. The evidence also indicates that Lucas's conduct caused the officers and emergency personnel to have safety concerns. The gist of Lucas's words were a refusal to accept medical treatment and orders for all personnel to leave his home. Lucas's loud words appear to be legitimately communicative, and it is not clear that the words were spoken for the purpose of disrupting lawful activities. Further, viewed in the light most favorable to Lucas, it is not clear that the officers' presence was lawful due to Lucas's clear demands for all to leave.[4] See Georgia v. Randolph, 547 U.S. 103, 120-21 (2006) (holding that a search conducted over the objection of a present and objecting co-occupant is unreasonable as to the objecting co-occupant);[5] United States v. Tatman, 397 Fed. Appx. 152, 160-64 (6th Cir. 2010); Fernandez v. Virgillo, 2013 U.S. Dist. LEXIS 20959, *16-*19 (D. Ariz. Feb. 15, 2013).

In terms of conduct occurring after the second tasing, O'Rafferty and Esparza submitted declarations that described Lucas's conduct. In pertinent part, O'Rafferty declared:

> While [Lucas] did eventually comply with directions that allowed him to be handcuffed, he again became angry and agitated. It took about four people to get him down the stairs as he continued to struggle. As he approached the bottom of the stairs, he began to bang his head against the wall. . . . Mr. Lucas was then restrained to a gurney and taken to Kaweah Delta Hospital by American Ambulance.

O'Rafferty Dec. at 3:16-22. Similarly, Esparza declared:

---

[3] Lucas would also be prohibited from challenging probable cause for the public intoxication conviction. However, defendants do not address the public intoxication conviction.

[4] The evidence indicates that the paramedics and firefighters were outside Lucas's residence when the police officers arrived, but that Monpere was inside. See PUMF's 10, 18, 26. The Court expresses no opinion about whether the officers' entry into Lucas's home was justified by concerns about Monpere's safety. Cf. Randolph, 547 U.S. at 118.

[5] Monpere testified that, although she did not verbally give permission, she considered the police officers to be in the residence with her permission. See Monpere Depo. 71:2-13.

11

> As we reached the bottom of the stairs, Mr. Lucas said he would comply and walk on his own. He did so, but, before reaching the bottom, he began to bang his head against the wall near where he had punched a hole in it. He did so quickly, striking the wall with his head about three times before we could stop him and get him to an area where he could not strike a wall with his body.
>
> He again became combative as I, Officer O'Rafferty, and several of the other medical personnel strapped him to a gurney. He then started laughing and derisively using racial descriptions for Latinos to belittle the American Ambulance personnel. The ambulance personnel transported Mr. Lucas to Kaweah Delta Hospital for evaluation and treatment.

Esparza Dec. at 4:13-23. These declarations reflect that Lucas was agitated and aggressive, used racial descriptions which the Court takes to mean either racial slurs or racially motivated statements, and interfered with the paramedics who were presumably transporting Lucas for treatment as per the police officers' direction. However, while Lucas's conduct and words clearly were not silent, there is no description of how loud Lucas's noises and words actually were.

The precise factual basis for Lucas's plea is unknown, and the officers themselves do not discuss their perception of a § 415(2) violation. Unfortunately, the evidence presented does not necessarily clarify when probable cause existed for the offense. The Court sees some elements of a § 415(2) offense before the second tasing, but not necessarily all of the elements. The same is true of Lucas's conduct after the second tasing. Because of Lucas's plea, the Court must accept that probable cause exists for a § 415(2) violation. Accepting that probable cause does exist at some point, the Court cannot hold that probable cause existed prior to the second tasing as a matter of law. Even if one accepts that there is a stronger basis for a § 415(2) offense prior to the second tasing due to Lucas's loud and profane words, Lucas's agitated and racially charged conduct after the second tasing provides at least an arguable basis for a § 415(2) offense.

The *Heck* bar applies only when a successful § 1983 lawsuit would *necessarily* imply or demonstrate the invalidity of a conviction. See Hooper, 629 F.3d at 1130-31. Where there is a factual basis for a conviction that does not depend on the constitutional violation being challenged in the § 1983 lawsuit, then the § 1983 lawsuit does not necessarily imply the invalidity of the conviction. See id.; Smith v. City of Hemet, 394 F.3d 689, 698-99 (9th Cir. 2005). Viewing the evidence in the light most favorable to Lucas, it is possible that probable

cause existed or developed after Lucas was tased the second time. Because Lucas's conduct after the second tasing could be the basis of his § 415(2) conviction, this lawsuit does not necessarily imply the invalidity of § 415(2) conviction. It has not been demonstrated that there is a *Heck* problem in this case. See id.

In sum, the Court cannot hold that probable cause existed as a matter of law prior to the second tasing. Without probable cause to arrest Lucas for violation of § 415(2) prior to the second tasing, the Court finds *Brooks* to be distinguishable. Qualified immunity on the basis of *Brooks* and probable cause to arrest under § 415(2) will be denied.

      b.      Qualified Immunity Based On *Mattos*

In *Mattos*, three police officers responded to a 911 domestic disturbance call. See Mattos, 661 F.3d at 438. When the officers arrived, the disturbance had apparently ended, and Mr. Mattos was sitting outside next to several open beer bottles. See id. Mr. Mattos became rude and agitated from the officers' questions. See id. When Mr. Mattos went inside to get his wife, Officer Agarano stepped inside. See id. at 439. Mr. Mattos became angry and ordered Agarano to leave, but Agarano did not leave and asked Mrs. Mattos if he could speak to her. See id. Officer Aikala then came inside the living room area, and said that Mr. Mattos was under arrest. See id. Mrs. Mattos was between Aikala and Mr. Mattos, and when Aikala went to arrest Mr. Mattos, he pushed against Mrs. Mattos. See id. Mrs. Mattos extended her arms against Aikala to stop her breasts from being smashed. See id. Aikala asked if Mrs. Mattos was touching an officer, but Mrs. Mattos tried to talk to Agarano and get everyone outside in order to diffuse the situation. See id. Aikala then shot Mrs. Mattos with his taser. See id. Mr. and Mrs. Mattos were arrested, and Mrs. Mattos was charged with harassment and obstruction. See id. The charges were later dropped. See id. The Ninth Circuit held that Mrs. Mattos Fourth Amendment rights were violated, but granted the officers qualified immunity. See id. at 451-52.

The Court finds that *Mattos* is distinguishable. It appears that a key consideration in *Mattos* was Aikala's attempt to arrest Mr. Mattos. Although the Ninth Circuit described both Mrs. Mattos's resistance and offense as "minimal," and it appears that her intentions were good, Mrs. Mattos did not move out of the way immediately when Aikala announced that Mr. Mattos

13

was under arrest, she was in between the arresting officer and her husband, she was attempting to get everyone calmed down and outside, and she physically (albeit defensively) pushed against Aikala. See id. at 438-39, 451. In other words, even though minimal, Mrs. Mattos's conduct was resistant and impeded Aikala's attempt to arrest Mr. Mattos. The officers could point to Mrs. Mattos's affirmative actions as a basis for using a taser. In this case, there is nothing similar. Lucas was not impeding the officers' attempts to arrest another, he posed no threat to anyone, the Court cannot say that there was probable cause to arrest Lucas under Penal Code § 415(2) prior to the second taser application, and, critically, Lucas had touched no one.

It is true that Lucas was not complying with commands and also was resisting O'Rafferty's attempts to roll him over and handcuff him. However, without probable cause to arrest, there was no basis for the officers to attempt to handcuff and arrest Lucas, and thus, no basis for Esparza to use her taser to get Lucas to comply. Further, under well established California law, citizens have the right to nonviolently resist a peace officer's unlawful actions. See In re Michael V., 10 Cal.3d 676, 681 (1974); Evans v. City of Bakersfield, 22 Cal.App.4th 321, 331 n.10 (1994); cf. Maxwell v. County of San Diego, 708 F.3d 1075, 1086 (9th Cir. 2013) ("[California Penal Code §148(a)] does not make it a crime, however, to resist unlawful orders."). Viewing the evidence in the light most favorable to Lucas, the officers' use of the taser, and attempts to roll over Lucas and handcuff him, were unlawful. The officers' attempts were preceded by an unconstitutional use of force and were done in the apparent absence of probable cause.

The evidence indicates the continued tasing of an individual in his home, without probable cause or justification for doing so. Based on the evidence presented, qualified immunity on the basis of *Mattos* will be denied.[6]

## CONCLUSION

Viewing the evidence in the light most favorable to Lucas as the non-moving party, the

---

[6] Again, the Court recognizes that Defendants' version of events is different from Lucas's and that there are genuine issues of disputed material fact. However, the Court must credit Lucas's version of events and view the evidence in the light most favorable to him. See Stegall, 350 F.3d at 1065.

Court cannot hold that probable cause to arrest Lucas under Penal Code § 415(2) existed prior to the second tasing.  Without probable cause to arrest, there was no justification or reason for the officers to demand that Lucas roll over and be handcuffed, nor was there reason or justification for Esparza to use the taser on Lucas to get him to comply.  The absence of probable cause distinguishes this case from *Brooks*, and Lucas's conduct was not sufficiently similar to Mrs. Mattos's conduct.  Given the evidence presented, the Court cannot grant qualified immunity on the basis of *Mattos v. Aragano*.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary judgment on the issue of qualified immunity for the second taser application is DENIED.

IT IS SO ORDERED.

Dated: ___July 13, 2013___

_____
SENIOR DISTRICT JUDGE